## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| M.W., by his next friend, Dionne Terry, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 10 C 7813 |
| v. | ) | |
| | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### I.  Introduction

Plaintiff, M.W. ("MW"), by his next of friend, Dionne Terry, brought this action for summary judgment and to reverse and remand the final decision of the Commissioner of the Social Security Administration, Michael J. Astrue ("the Commissioner"), who denied his claim for Social Security Income ("SSI"). The Commissioner requests this Court affirm the Administrative Law Judge's ("ALJ") decision and allow the Appeals Council's decision to become the final matter on MW's SSI benefits. For the reasons discussed herein, MW's motion for summary judgment is granted [dkt.25].

### II.  Procedural History

On May 14, 1999, Ms. Terry, MW's mother, filed an application for SSI benefit payments on behalf of her minor son, MW.[1]  She claimed that since March 1, 1996,[2] MW had been disabled

---

[1] R. at 106-08.
[2] R. at 106.

due to chronic asthma and "Gastrolitis" [sic].[3]  In a determination dated December 8, 1999, MW became eligible for SSI benefit payments as of May 1, 1999.[4]  During a Report of Continuing Disability Interview on July 29, 2003, Ms. Terry indicated that MW developed Attention Deficit Hyperactive Disorder ("ADHD"), allergies, and various learning disabilities; additionally, she amended her initial filing to include MW's behavioral outbursts.[5]  On December 18, 2003, it was determined that MW, eight years old at the time, was no longer eligible for SSI benefit payments as of December 12, 2003.[6]  Ms. Terry filed a Request for Reconsideration on February 27, 2004,[7] which was denied by notice dated October 19, 2004.[8]

On October 28, 2004, Ms. Terry filed a request for a hearing before an ALJ.[9]  A Notice of Hearing was sent to MW on June 26, 2006, for a hearing on August 4, 2006.[10]  After failing to report to the initial hearing,[11] an additional Notice of Hearing was provided to MW on November 30, 2006, for a hearing set for December 8, 2006.[12]  At that initial hearing, Ms. Terry was informed by ALJ Percival Harmon about MW's right to have legal representation and the hearing was postponed to allow Ms. Terry an opportunity to seek representation on MW's behalf.[13]  MW's SSI benefit hearing was held on June 18, 2007, where he was represented by Amy Marinacci from the Legal Assistance

---

[3]R. at 106, 114.
[4]R at 14.
[5]R. at 133-42.
[6]R. at 14, 67.
[7]R. at 72.
[8]R. at 75.
[9]R. at 79.
[10]R. at 81.
[11]R. at 103.
[12]R. at 54, 655.
[13]R. at 655-70.

Foundation.[14]  Following the hearing, the ALJ issued an unfavorable opinion on June 29, 2007, finding that MW was not disabled under the Social Security Act.[15]

On August 30, 2007, MW filed a request for review of the ALJ's determination with the Social Security Administration's Appeals Council.[16]  A Notice of Appeals Council Action was received by MW on October 5, 2010 which informed him that his appeal was denied, making the ALJ's June 29, 2007 decision the final administrative determination of the Commissioner.[17]  MW now seeks judicial review from this Court.

## III.    Statement of Facts

MW was eleven years old and in the fifth grade at the time ALJ Harmon issued his opinion. He lived with Ms. Terry, his mother, and eight siblings.  The record consists of school and medical records that demonstrate his learning and behavioral impairments and the administrative hearing transcript.  The Court will discuss each of these categories of evidence in turn.

## A.    School Records

The Court notes that the school records were not completed for SSI purposes but help to provide insight into many of MW's issues.  In November 2003, when MW was in second grade, it was determined that he should receive an Individualized Education Plan ("IEP"), allowing him to obtain extra treatment for his learning and behavioral issues.[18]  The initial IEP provided that MW should acquire 400 minutes per week of in-class special education services: 175 minutes per week for "Language/English/Reading," 175 minutes per week for "Mathematics," and 50 minutes per

---

[14]R. at 671-743.
[15]R. at 14-30.
[16]R. at 650-54.
[17]R. at 7-9.
[18]R. at 301-19.

week in the "Social/Emotional" area.[19]  This initial IEP determined that it was not necessary to

remove MW from his regular classroom to receive additional help.[20]  Additionally, the IEP indicated

that MW had slight difficulty with visual-motor coordination which resulted in a recommendation

of a reduced workload and extended time for homework and in testing situations.[21]  Under the

category "Functional Analysis & Behavior Intervention Plan," the initial IEP noted  behavioral

issues towards peers in the classroom and an inability to control his temper in both the classroom

and in the lunchroom.[22]  In particular, MW would become upset when his possessions were taken

away.[23]  Finally, the IEP indicated that Ms. Terry believed the reason for MW's learning problems

was that "he was exposed or treated for lead poisoning" prior to entering school.[24]

That same year, MW's report card showed that he received a mixture of grades ranging from

an A in art and Bs in music, health, physical education, and drama, to Ds in reading, writing, and

mathematics.[25]  Mrs. Navarro, MW's second grade teacher, reported that MW struggled

academically all year, resulting in him working below grade level.[26]  She stated that he lacked focus

in the classroom, failed to complete assignments, and that he needed to work on his behavioral

issues.[27]  Notably, Mrs. Navarro reported that MW was difficult to calm down, used inappropriate

language, would fight with his peers, and failed to cooperate with her, and was disrespectful to her.[28]

Despite these behavioral issues, Mrs. Navarro noted that MW did well in class when he chose to

---

[19]R. at 313.
[20]*Id.*
[21]R. at 317.
[22]R. at 307.
[23]*Id.*
[24]*Id.*
[25]R. at 327-28.
[26]R. at 302.
[27]R. at 330.
[28]R. at 250, 253.

focus on his work and when he did, he worked very hard and completed his assignments.[29] Finally, she also reported that MW had 30 absences during the course of the school year.[30]

During the 2004-2005 school year, when MW was in third grade, his IEP was modified to meet his developing needs. The new IEP provided that MW would be removed from his regular classroom for 350 minutes per week for special education services in a separate classroom, away from his peers, allowing him to work on his social and emotional needs.[31] A modified criterion was implemented in reading and mathematics because "MW is working below grade level and requires additional assistance in order to succeed in [those subjects]."[32] The school implemented a new grading scale to help MW achieve his IEP goals.[33] The modified grades were: A = 100-85; B = 84-70; C = 69-60; D = 59-50.[34] Additionally, the modified IEP pertain solely to MW's academic struggles. Under "Learning Characteristics," the IEP stated that MW had the following behavioral issues: following directions; processed information slowly; had difficulty understanding concepts; had difficulty following multiple verbal requests; was frequently distracted by extraneous noises; spelled poorly; had trouble putting ideas on paper; and was slow to switch from one task to another.[35] There was further recommendation that MW should be placed in after-school programs and summer school to help him reach grade level in his classes, especially in reading and mathematics.[36] There is no documentation that MW followed through on the school's recommendation.

---

[29]R. at 330.
[30]R. at 329.
[31]R. at 384.
[32]R. at 387.
[33]*Id.*
[34]*Id.*
[35]R. at 389.
[36]R. at 388.

MW's 2004-2005 report card indicated that he continued to struggle despite the initial IEP implementation. MW did improve in some areas, earning Bs in listening and speaking standards.[37] However, he also received a C in library science and Ds in reading, writing, mathematics, science, and social sciences.[38] Ms. Simpson, MW's third grade teacher, noted that MW tried his best in class, but that the basic reading skills at the third grade level were too difficult for him.[39] However, she stated that MW continued to try hard to improve his grades[40] and that "MW has strength in working in cooperative and small group settings. He has good leadership skills."[41] Finally, Ms. Simpson indicated that his grades would improve if MW regularly attended class.[42]

During the 2005-2006 school year, there was no documentation that indicated there was any modification to MW's IEP. MW's fourth grade report card with the modified IEP grading scale showed that he received a mixture of grades, including an A in art, but Cs or Ds in every other class, including reading, writing, mathematics, science, and social sciences.[43] In regards to his behavioral issues, Ms. Garrison, MW's fourth grade teacher, noted that MW needed improvements in: exercising self-control; making appropriate decisions independently; accepting teacher guidance; following class routines, rules, and regulations; and respecting school property or the property of his peers.[44] Yet, despite these behavioral problems, in his first reporting period, Ms. Garrison lauded MW as a group leader and as a hard worker, when he chose to be.[45]

---

[37] R. at 613-14.
[38] *Id.*
[39] R. at 616.
[40] *Id.*
[41] R. at 382.
[42] R. at 428.
[43] R. at 599.
[44] R. at 597.
[45] R. at 598.

The 2006-2007 school year IEP was modified again to help better meet MW's learning and behavioral needs.[46] MW's special education services were increased to 500 minutes per week, 300 minutes for language arts and 200 minutes for mathematics.[47] The modifications additionally required that MW meet a social worker for 30 minutes per week to help address his social and emotional needs.[48] The IEP also showed that MW had the following learning issues: distracted easily and lost focus and concentration; had difficulty putting ideas on paper; needed extended time on tasks for classroom and homework assignments by one-third; needed to be tested on one concept at a time; had difficulty following multiple verbal requests; was slow switching from one task to another; and needed to be provided motivation and verbal rewards on a daily basis.[49] However, under the category "General Considerations in the Development of the IEP," it was noted that MW had great leadership ability and strong peer interactions.[50]

MW's 2006-2007 school year report card shows that he received a mixture of grades ranging from Bs in art, music, library, listening standards, speaking standards, and physical education, a C in reading, and Ds in writing, mathematics, science, and social sciences.[51] It was noted that MW tried in class and that he liked to learn.[52] Finally, the report card stated that MW was a good listener.[53]

---

[46]R. at 643-49.
[47]R. at 643.
[48]*Id.*
[49]R. at 648.
[50]R. at 635.
[51]R. at 297.
[52]R. at 587.
[53]*Id.*

B.    **Medical Records**

MW has also received medical treatment and assessments outside of the school setting.  In a May 2004 Social Security Administration Childhood Disability Evaluation Form, when MW was in second grade, a state agency physician, E.C. Bone, M.D. ("Dr. Bone"),  reviewed MW's SSI record evidence.[54]    Following the six-domain Medical Listing of Impairments for Minors, implemented by the Commissioner, Dr. Bone found that there was no evidence in MW's file to support any limitations in the domain of attending and completing tasks and noted that MW had begun his IEP under the acquiring and using information domain.[55]  However, he noted that MW had a marked limitation in the domain of interacting and relating with others, specifically that he was impulsive,  very aggressive towards his peers and siblings, easily angered, threw temper tantrums, was very hyper, and that he was difficult to control.[56]

On October 18, 2006, the Abraham Lincoln Center ("Lincoln Center") conducted a mental health assessment of MW.[57]  The assessment noted that MW's thought content, mood, and speech were within normal limits.[58]  In addition to these assessments, the Lincoln Center also found that MW appeared isolated and that his recent memory evaluation showed moderate limitations.[59]  It was determined that MW had the following medical issues: asthma, ADHD, Oppositional Defiant Disorder ("ODD"), and learning impairments.[60]  MW was described as very calm and quiet and that

---

[54]R. at 334-337A.
[55]R. at 336.
[56]*Id.*
[57]R. at 530-41.
[58]R. at 534-35.
[59]R. at 533-34.
[60]R. at 530.

he thought before he provided the evaluator an answer.[61]  The report also noted that five other of Ms. Terry's children, along with MW, had suffered from lead poisoning.[62]

On December 6, 2006, MW received an assessment from Maximizing Learning in Schools Consulting, Inc. ("MLS").[63]  The MLS Mental Status Examination noted that MW was a shy and quiet boy, speaking minimally.[64]  The evaluator, Mashana L. Smith, M.D. ("Dr. Smith"), a licensed clinical psychologist, stated that MW did not engage in any spontaneous conversation and that he barely spoke above a whisper.[65]  During the examination, MW's mood was deemed "unremarkable in intensity and showed little variation."[66]  While the evaluator considered his thought content as normal, MW was unable to identify anything about himself that he liked and noted that he appeared to have limited insight and judgment.[67] At the end of the evaluation, MLS recommended that MW receive academic tutoring to help his reading skills and that he receive "Adovcay [sic] to help secure education services needed to accommodate [his] disabilities."[68]

A May 18, 2007 Behavior Rating Inventory of Executive Function ("BRIEF") report was conducted to provide a better understanding of MW's self-control and problem-solving skills by measuring different aspects of MW's executive functioning.[69]  The BRIEF report rating of MW's executive function, exhibited in his everyday behaviors, revealed no concerns and noted that his ability to control his thoughts, behaviors, and emotions were at an appropriate level for his age.[70]

---

[61]R. at 534.
[62]R. at 536.
[63]R. at 542.
[64]R. at 543.
[65]*Id.*
[66]*Id.*
[67]*Id.*
[68]R. at 544.
[69]R. at 621-24.
[70]*Id.*

9

Specifically, MW was described as being appropriately able to initiate an activity and problem solve, to plan and organize his approach to solving a problem, and to monitor his own behavior as appropriate for his age.[71]  In addition, the BRIEF report noted that MW was able to hold an appropriate amount of information in his "active memory" for mental manipulation.[72]  As a result, he was deemed able to remain attentive and focused for appropriate lengths of time when required of him.[73]  MW was described as being reasonably well-organized and generally able to maintain the orderliness of things in his environment, and he was typically able to find his belongings or his materials when he needed them.[74] The BRIEF report concluded that MW was described as being able to resist impulses and to consider the potential consequences of his actions before acting.[75]

In a May 22, 2007 letter, Jean Kenron ("Ms. Kenron"), MSW, LSW, a social worker from the Lincoln Center, conducted another evaluation of MW.[76]  She noted that MW continued to struggle with symptoms of his learning impairments and that he had difficulty in regulating and expressing his emotions appropriately.[77] Because of these deficiencies, MW required individualized treatment to help him focus on various tasks when given to him.[78] Of importance, it was noted that MW did not have autism despite the fact that he is severely delayed in his ability to recognize and express words properly.[79]  Although MW was eager to learn and participate in class, Ms. Kenron deemed that MW needed extra attention to help him focus on and participate in reading and

---

[71]*Id.*
[72]*Id.*
[73]*Id.*
[74]*Id.*
[75]*Id.*
[76]R. at 529.
[77]*Id.*
[78]*Id.*
[79]*Id.*

writing.[80]  She concluded that MW's ADHD and ODD not only affected his academic abilities, but that it caused him to struggle expressing himself properly, which caused behavioral issues.[81]

Between 2004-2007, MW was regularly prescribed medication for his asthma, ADHD, ODD, and various learning disabilities.[82] Those medications were Concerta, Strattera, and Adderall.[83]

## C.     Hearing Testimony

There were two hearings regarding MW's SSI benefits. The first hearing was held on December 8, 2006.[84]  This hearing was reset for two reasons.  First, Ms. Terry did not know that MW could be represented by an attorney. ALJ Harmon, therefore, explained to her how to seek representation.[85] Second, the rescheduling allowed the ALJ time to review the record, which was provided to him that day.[86]  Although little happened, it is worth noting that MW was inaudible the brief amount that he tried to communicate to the ALJ.[87]

The final determination hearing took place on June 18, 2007.[88]  At this hearing MW was represented by Ms. Marinacci from the Legal Assistance Foundation.[89]  In addition, a psychologist, Keenan Ferrell, M.D. ("the ME"), was present at the hearing as the ALJ's medical expert.[90]  The ALJ began by noting that while he looked at MW's report cards and IEPs, he stated that he had seen "far worse . . . report cards in terms of grades," and that, in his role as ALJ, he had "learned that [special education grades] alone is not indicative of any result in [these] case[s]."[91]  Additionally,

---

[80]*Id.*
[81]*Id.*
[82]R. at 522-28, 547-82.
[83]*Id.*
[84]R. at 655.
[85]R. at 659-60.
[86]R. at 667.
[87]R. at 657.
[88]R. at 671.
[89]R. at 674.
[90]*Id.*
[91]R. at 683.

before any testimony, he also stated that just because a child needs extra help in special education classes, this fact alone does not lead to a conclusion that a child meets the requirements for SSI benefits.[92]

First to testify was MW's mother, Ms. Terry. Throughout her testimony, Ms. Terry talked about MW's struggles both inside and outside of the classroom, not only the aforementioned academic and behavioral issues, but also MW's struggles to make friends.[93] She testified that she was routinely called to school to help address MW's behavioral issues.[94] Ms. Terry stated that MW took the following medications for his various ailments: Adderall XR for ADHD; Advair diskette; Singulair pills; creams for eczema; Claritan eye drops for his allergies; and used an nebulizer for his asthma.[95] She additionally testified that she believed the school and teachers, especially the evaluations during the 2006-2007 school year, misrepresented MW's positive participation in class.[96] She believed that his teacher did not cooperate with the IEP as a result of her persistent complaints to the school, because MW did not work well when in a group, including at home with his siblings.[97] During this part of Ms. Terry's testimony, ALJ Harmon explicitly noted that Ms. Terry's claims were "really interesting," because "usually . . . I don't have problems with documentation of behavioral problems."[98]

Outside of the classroom, Ms. Terry testified that MW was "active" in the house by pacing around and displayed defiant behavior when he did not get his way.[99] She noted that this behavior

---

[92]R. at 684.
[93]R. at 684-86, 707-26.
[94]R. at 708.
[95]R. at 713.
[96]R. at 685.
[97]Id.
[98]R. at 717.
[99]R. at 718-19.

resulted in altercations with siblings, including name-calling, destruction of their toys, and physical confrontations.[100] Finally, she recounted for ALJ Harmon that MW was discharged from an after-school program for fighting and acting disobedient to the staff[101] and that MW's only friends were his thirteen-year-old brother and one of his brother's friends.[102]

Next to testify was MW. MW appeared shy and was inaudible throughout, often responding to questions from the ALJ and Ms. Marinacci with one word answers.[103] When ALJ Harmon questioned MW about his friends at school, MW indicated that he had none and that the only friend that he had was a friend of his thirteen-year-old brother.[104] Also, MW testified that he had trouble with homework because it was too hard, which results in him not completing most of it.[105] During a discussion about his behavioral issues, MW openly acknowledged that he was often in trouble at school, including an incident in which he got into a fight during class, resulting in him being sent to the special education classroom.[106] Outside of the classroom, MW additionally acknowledged that he needed to be disciplined at home due to his conduct, including an incident when he broke a computer monitor when a sibling told him that his time on the computer was completed.[107]

Last to testify was the ME. The ME reviewed all the record evidence, including the IEPs, MLS Report, and Lincoln Center Evaluations, and provided the ALJ with his professional evaluation of these records.[108] While relying heavily upon the 2006 Lincoln Center Evaluation, the ME testified that MW had a less than marked limitation in the domain of acquiring and using

---

[100]R. at 719.
[101]R. at 722.
[102]R. at 726.
[103]R. at 686-707.
[104]R. at 691.
[105]R. at 693.
[106]R. at 694-95, 702.
[107]R. at 705.
[108]R. at 728-35.

information, a less than marked limitation in the domain of attending and completing tasks, and a less than marked limitation in the domain of interacting and relating with others.[109] He noted that while MW clearly demonstrates behavior problems, "overall . . . the data indicates that he is within control of those behaviors, and that with intervention, he does seem to respond to attempts made by professionals to correct his behavior."[110] According to the ME, the distinction was that although there were clearly concerns about his behavior, MW seemed to have the cognitive ability to understand right from wrong and the ability to execute it when he want to.[111] Because of MW's perceived ability to control his own functions, the ME concluded that MW had no marked limitations.[112]

## IV. Social Security Regulations

When seeking SSI on behalf of a child, the claimant must demonstrate that the minor child is disabled as defined by the Social Security Act and corresponding Regulations. The Regulations require a sequential three-step analysis to determine whether a child is disabled.[113] But for purposes of this case, the ALJ used a three-step medical improvement review standard. Those three steps require a determination as to: (1) whether medical improvement has occurred; (2) whether the claimant's impairment meets or medically equals the same listing that it met or equaled at the time of the comparison point decision; and (3) whether the claimant is currently disabled under the rules.[114] This last step requires a determination as to whether the claimant has a medically determinable "severe" impairment.[115]

---

[109]*Id.*
[110]R. at 733.
[111]R. at 737.
[112]R. at 738.
[113]20 C.F.R. § 416.924.
[114]20 C.F.R. § 416.994a.
[115]*Id.*

14

In determining whether an impairment or combination of impairments functionally equals the listings, the ALJ analyzes the claimant's functioning in terms of six domains.[116] Theses six domains are:

> (1) Acquiring and Using Information,
> (2) Attending and Completing Tasks,
> (3) Interacting and Relating with Others,
> (4) Moving About and Manipulating Objects,
> (5) Caring for Yourself, and
> (6) Health and Physical Well-Being.[117]

To be deemed functionally equivalent, the claimant's impairments must result in a marked limitation in two of the domains or an extreme limitation in one domain.[118] A marked limitation is an impairment that seriously interferes with the claimant's "ability to independently initiate, sustain, or complete activities."[119] "Marked limitation also means a limitation that is more than moderate but less than extreme."[120] An extreme limitation is an "impairment [that] interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities."[121]

## V.    ALJ's Decision

In his June 29, 2007 decision, ALJ Harmon determined that "a more prompt finding that disability continues may be made" by skipping the three-step sequential analysis in accordance with 20 C.F.R. § 416.994a(b). By using the three-step medical improvement review standard, ALJ Harmon determined that MW was not disabled within the meaning of the Social Security Act.[122]

---

[116] 20 C.F.R. § 416.926a.
[117] 20 C.F.R. § 416.926a(b)(1)(i)-(vi).
[118] 20 C.F.R. § 416.926a(d).
[119] 20 C.F.R. § 416.926a(e)(2)(i).
[120] *Id.* (internal quotations omitted).
[121] 20 C.F.R. § 416.926a(e)(3)(i).
[122] R. at 14.

15

At step one of the disability termination test, the ALJ must determine whether medical improvement has occurred in the impairments that the claimant had since the last disability determination (i.e., the comparison point decision or "CPD").[123]  ALJ Harmon found that "medical evidence supports a finding that, as of December 12, 2003, there had been a decrease in medical severity of the impairments present at the time of the CPD."[124]

At step two, the ALJ must determine whether the claimant's impairments at the CPD still meet or equal the severity of the listed impairments met or equaled at the time of the CPD.[125]  The ALJ must use the listing that was written at the time of the CPD, even if it has since been revised or removed from the Listing of Impairments.[126]  The ALJ determined that MW's impairments met the impairments at the time it was written.[127]

At step three, the ALJ must determine if the claimant is currently disabled under the rules in 20 C.F.R. § 416.924(c) and (d), considering all the impairments that the claimant might have, including any not present or considered at the CPD.[128]  For an individual who has not attained age eighteen, a medically determinable impairment or combination of impairments is not severe if it is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations.[129]  The ALJ determined that MW's impairments were not to the level required for SSI benefits.[130]

---

[123]*See generally* 20 C.F.R. § 416.994a.
[124]R. at 17.
[125]*See generally* 20 C.F.R. § 416.994a.
[126]*Id.*
[127]R. at 29.
[128]*See generally* 20 C.F.R. § 416.994a.
[129]20 C.F.R. § 416.994a(b)(3)(i).
[130]R. at 17-22, 29.

In using this termination three-step process, the ALJ found that MW did not have an impairment or combination of impairments that functionally equaled the listings. In making this finding, the ALJ examined each of the six domains and made a finding regarding MW's limitations.[131] ALJ Harmon gave controlling weight to the opinion of the ME, not to the school reports or other individuals who personally dealt with MW.[132]

First, he determined that MW had a less than marked limitation in "Acquiring and Using Information."[133] The Regulations define acquiring and using information as how well the claimant acquires or learns information and how well that information is used.[134] A school-age child (i.e., a child age 6 to the attainment of age 12) without an impairment "should be able to learn to read, write, and do math, and discuss history and science."[135] A non-impaired child will "use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change)."[136] Finally, the child "should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing [the school-age child's] own ideas, and by understanding and responding to the opinions of others."[137]

With regards to the first domain, ALJ Harmon simply noted that since MW's teachers showed improvement in this domain, and that there was no indication of any current marked

---

[131]*See generally* 20 C.F.R. § 416.994a.
[132]R. at 24.
[133]R. at 25.
[134]20 C.F.R. § 416.926a(g).
[135]20 C.F.R. § 416.926a(g)(2)(iv).
[136]*Id.*
[137]*Id.*

17

limitation, that MW's impairments did not rise to the level of marked in acquiring and using information.[138]

Second, the ALJ found that MW had a less than marked limitation in "Attending and Completing Tasks."[139] The Regulations define attending and completing tasks as how well the claimant is able to focus and maintain his attention, and begin, carry through, and finish activities.[140] A school-age child "should be able to focus his attention in a variety of situations in order to follow directions, remember and organize school materials, and complete classroom and homework assignments."[141] Additionally, there should be a relative ease to the changing of activities or routines without the child distracting themselves or others, and the ability to stay on task and in place when appropriate.[142] Finally, the child "should also be able to complete a transaction task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.[143] The ALJ ascertained that although MW had problems with his ability to focus and maintain attention, school and testing records demonstrated improvement from his CPD and supported the ME's opinion.[144]

Third, the ALJ found that MW had a less than marked limitation in "Interacting and Relating with Others.[145] In the Regulations, interacting and relating with others is defined as how well the claimant initiates and sustains emotional connections with others, develops and uses the language of his community, cooperates with others, complies with rules, responds to criticism, and respects

---

[138] R. at 25.
[139] R. at 26.
[140] 20 C.F.R. § 416.926a(h).
[141] 20 C.F.R. § 416.926a(h)(2)(iv).
[142] *Id.*
[143] *Id.*
[144] R. at 26.
[145] *Id.*

and takes care of the possessions of others.[146]  A school-age child "should be developing more lasting friendships with children who are of the same age."[147]  School-age children "should begin to understand how to work in groups to create projects and solve problems."[148]  Lastly, the claimant "should be able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand."[149]

ALJ Harmon agreed with the ME's opinion that MW was less than marked in this domain, but stated that MW's "behavior in this domain is somewhere between less than marked and marked based on the facts that he has no friends and has exhibited behavior problems."[150]  He provided no further explanation.

Fourth, the ALJ determined that MW had a less than marked limitation in "Moving About and Manipulating Objects."[151]  In the Regulations, moving about and manipulating objects is defined as how well a child is able to move his body from one place to another and how a child moves and manipulates objects.[152]  The Regulations provide that a school-age child "should have gross motor skills that let him move at an efficient pace at school, home, and throughout the neighborhood."[153]  A school-age child without an impairment develops fine motor skills which allows them "to do things like use many kitchen and household tools independently, use scissors, and write."[154]

---

[146]20 C.F.R. § 416.926a(i).
[147]20 C.F.R. § 416.926a(i)(2)(iv).
[148]*Id.*
[149]*Id.*
[150]R. at 26.
[151]R. at 27.
[152]20 C.F.R. § 416.926a(j).
[153]20 C.F.R. § 416.926a(j)(2)(iv).
[154]*Id.*

The ALJ acknowledged that MW's difficulties with asthma and allergies reduced his physical capacity to some extent.[155] Ultimately, however, he concluded that it did not rise to the level of a marked limitation.[156]

Fifth, the ALJ found that MW had a less than marked limitation in "Caring for Yourself."[157] The Regulations define caring for yourself as how well a child maintains a healthy emotional and physical state, including how well a child satisfies his physical and emotional wants and needs in appropriate ways.[158] The claimant "should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior."[159] The Regulations state that school-age children "begin to demonstrate control over [their] behavior, and [they] should be able to avoid behaviors that are unsafe or otherwise not good for [them]."[160] Finally, under "Caring for yourself," the claimant "should begin to imitate more of the behavior of adults [they] know."[161] ALJ Harmon found no evidence in the record to indicate a marked problem in this domain.[162]

Lastly, the ALJ determined MW had a less than marked limitation in "Health and Physical Well-Being."[163] In the Regulations, health and physical well-being considers the cumulative effects of physical and mental impairments and any associated treatments or therapies on a child's functioning that were not considered in the evaluation of the child's ability to move about and manipulate objects.[164] Although there is no age group descriptors for "Health and Physical Well-

---

[155]R. at 27.
[156]*Id.*
[157]R. at 28.
[158]20 C.F.R. § 416.926a(k).
[159]20 C.F.R. § 416.926a(k)(2)(iv).
[160]*Id.*
[161]*Id.*
[162]R. at 28.
[163]*Id.*
[164]20 C.F.R. § 416.926a(k).

being," the Regulations state that when there is a physical impairment(s), mental impairment(s), or a combination of either, which have physical effects on the claimant that cause "extreme" limitation on his or her functioning, the claimant will generally have an impairment(s) that "meets" or "Medically equals" a listing.[165]  As in under "Moving About and Manipulating Objects," the ALJ found that MW's asthma and allergies provided limitations, but not to the level which equaled marked in this domain.[166]

## VI.    Standard of Review

When reviewing an SSI benefits claim, the Court performs a *de novo* review of the ALJ's conclusions of law, but the ALJ's factual determinations are entitled to deference.[167]  This Court will uphold the ALJ's decision if "substantial evidence" supports the findings of the decision and if the findings are free from legal error.[168]  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[169]  Where reasonable minds differ, it is for the ALJ, not this Court, to make the ultimate finding as to disability.[170]  That is, the Court "cannot reconsider facts, reweigh the evidence, decide questions of credibility, or otherwise substitute our judgment for that of the ALJ."[171]

Yet, in every administrative disability hearing, the ALJ must do more than fully and fairly develop the record presented to it.[172]  This Court will respect the reasoned judgment of the ALJ in determining how much evidence to gather;[173] but the ALJ must make an accurate and logical

---

[165]*Id.*
[166]R. at 28.
[167]*Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).
[168]42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).
[169]*Richardson v. Perales*, 402 U.S. 389 (1971).
[170]*Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993).
[171]*Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).
[172]*Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997).
[173]*Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994).

connection from the evidence to the ultimate conclusion.[174]  While the ALJ is not required to discuss

every piece of evidence, the ALJ must minimally articulate his reasons for crediting or discrediting

evidence of disability.[175]  When the ALJ's decision either "lacks evidentiary support or is so poorly

articulated as to prevent meaningful review, a remand is required."[176]

## VII.   Analysis

MW asserts that ALJ Harmon did not properly articulate why his impairments did not meet

the level of a marked limitation for three of the six functional domains: acquiring and using

information, attending and completing tasks, and interacting and relating with others.[177]  Within the

discussion of the three functional domains, we will address MW's additional arguments that ALJ

Harmon's determination that MW's grades were improving was not properly assessed considering

the modification in the grading scale, and that ALJ Harmon failed to explain how MW's behavior

was volitional.[178]

## A.   Acquiring and Using Information

MW argues that the ALJ made an improper determination in this domain because MW's

grades were not improving and his need for special education services was increasing. Under

"Acquiring and Using Information," the ALJ found that MW was "less than markedly limited"

because "[r]eports of the teachers show improvement in this regard . . . ."[179]  The Regulations provide

that a school-age child without an impairment should "be able to learn to read, write, and do math,

---

[174]*Dixon v. Massanori*, 270 F.3d 1171, 1176 (7th Cir. 2001).
[175]*Clifford*, 227 F.3d at 870.
[176]*Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (internal quotations omitted).
[177]Pl. Mem. at 8.
[178]*Id.*
[179]R. at 25.

and discuss history and science."[180] Some examples of difficulties children could have in acquiring and using information include difficulty solving mathematics questions or computing arithmetic answers, talking only in short, simple sentences, and difficulty explaining what the child means.[181]

### 1. The ALJ Decision is Deficient Because It Did Not Address the Modified Grading Scale

Throughout his decision, ALJ Harmon noted MW's yearly report cards.[182] They included a range of grades, from As and Bs in listening standards, speaking standards, and research standards[183] to Ds in reading, writing, mathematics, science, and social science.[184] Referring to MW's grades, ALJ Harmon found that the "[r]eports of [MW's] teachers show improvement in this regard" and, therefore, "there is no indication of any current marked limitation in this domain."[185]

MW cites to *Hopgood ex rel. L.G. v. Astrue*, a Seventh Circuit case where the ALJ committed error when he "failed to explain why he did not credit portions of the record that were favorable to [the claimant]."[186] In that case, the ALJ determined that the claimant's improved grades of As, Bs, Cs, and Ds was sufficient to show that there was no marked limitation in the acquiring and using information domain, despite the fact that the claimant only needed to turn in 60% of his assignments.[187] The court found that the ALJ's determination was insufficient because the 60% requirement showed that the claimant's "teachers recognized [his] limitations."[188] Without looking at evidence that was favorably presented by the claimant, the ALJ's analysis was deficient.[189]

---

[180]20 C.F.R. § 416.926a(g)(2)(iv).
[181]20 C.F.R. § 416.926a(g)(3)).
[182]R. at 18, 19, 20.
[183]R. at 20.
[184]R. at 18, 19, 20.
[185]R. at 25.
[186]*Hopgood*, 578 F.3d at 700; *see Murphy v. Astrue*, 496 F.3d 630, 634-35 (7th Cir. 2007).
[187]*Hopgood*, 578 F.3d at 700.
[188]*Id.*
[189]*Id.*

Similarly, ALJ Harmon's decision is deficient because it fails to account for the IEP modified grading scale. At no time did ALJ Harmon specifically mention or address the fact that during the 2003-2004 school year MW's school implemented a modified grading scale. After the change, MW only had to receive a 50% or higher to pass his classes, and a 60% or higher to receive a C.[190] Similar to the 60% requirement in *Hopgood*, the modified grading scale indicated that MW's teachers recognized his limitations in the classroom. When addressing this issue, ALJ Harmon merely stated that MW was "making progress in class according to IEP goals."[191] With only this statement, we do not know how the ALJ assessed MW's progress and the argument put forward by MW that his grades were not improving.

Additionally, the Regulations specifically state that a child without impairments "should be able to learn to read, write, and do math, and discuss history and science."[192] MW's grades from second through fifth grade demonstrated that in these core subjects he did not receive higher than a C, half of which he was only required to attain a 60% or higher.[193] Reliance on higher marks in non-core classes, such as physical education, listening standards, speaking standards, and research standards,[194] does not accurately portray the criterion set under "Acquiring and Using Information."

## 2. The ALJ Decision is Deficient Because It Did Not Properly Address the Increase in MW's Special Education Services

---

[190]R. at 387.
[191]R. at 20.
[192]20 C.F.R. § 416.926a(g)(2)(iv).
[193]R. at 297, 327, 599, 613.
[194]R. at 20.

In his second argument under this domain, MW argues that his increasing need for special education services was not properly addressed.[195]  In his decision, ALJ Harmon acknowledged MW's placement in special education for learning impairments in 2003,[196] that he continued to receive special education in 2007,[197] and that MW participated in 500 minutes per week of special education.[198]  The Commissioner maintained that while MW did receive special educational services, that fact "[did] not negate that he improved in his ability to acquire and use information, especially considering the narrative comments made by Plaintiff's teachers."[199]

Like in *Hopgood*, the Seventh Circuit in *Giles ex rel. Giles v. Astrue*, found that where it is unclear what evidence is used to support a finding of not marked, the case must be remanded.[200]  Specifically, we "require an explanation of why strong evidence favorable to the plaintiff is overcome by the evidence on which an ALJ relies."[201]  As in *Hopgood,* error was found when the ALJ did not credit teachers' reports that found the claimant had serious or obvious problems in the acquiring and using information domain.[202]

Here, we find that ALJ Harmon needed to articulate - on some level - how he assessed special education services when determining that MW had improved in this domain.  The record clearly lays out that since the initial IEP in November 2003, MW went from 400 minutes per week of in-class special education services[203] to 350 minutes per week in a separate special education

---

[195]Pl. Reply at 4.
[196]R. at 18.
[197]R. at 20.
[198]R. at 22.
[199]Def. Bf. at 9.
[200]483 F.3d 483, 488 (7th Cir. 2007).
[201]*Giles ex rel. Giles*, 483 F.3d at 488; *see Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001).
[202]*Hopgood*, 578 F.3d at 700; *see Murphy*, 496 F.3d at 634-35.
[203]R. at 313.

classroom during the 2004-2005 school year[204] to 500 minutes per week of special education services in 2006-2007.[205] While the ALJ is not required to discuss every piece of evidence, the ALJ must minimally articulate his reason for crediting or discrediting evidence of disability.[206] The basic statement that "[r]eports of the teachers show improvement in this regard . . ."[207] is insufficient.

**B.     Attending and Completing Tasks**

MW argues that ALJ Harmon's decision that MW's focus had improved was an improper determination because "[e]ven if MW's attention had improved, that does not support a conclusion that MW did not have marked limitations in this domain."[208] Under "Attending and Completing Tasks," the ALJ determined that MW "had less than marked limitation" despite "problems with focus and attention."[209] ALJ Harmon concluded that "the evidence of record including school records and testing records support the opinion of the medical expert that there is a less than marked limitation in his domain. His ability to focus and concentrate appear to have improved."[210] The Regulations state that a school-age child without impairment should be able to focus his attention in a variety of situations in order to follow directions, remember and organize school materials, and complete classroom and homework assignments.[211] The ALJ provided some examples of difficulties children could have in attending and completing tasks, including being slow to focus on, or unable to complete, activities of interest and requiring extra supervision to remain engaged in an activity.[212]

---

[204]R. at 384.
[205]R. at 643.
[206]*Clifford*, 227 F.3d at 869.
[207]R. at 25.
[208]Pl. Mem. at 14, n. 4.
[209]R. at 26.
[210]*Id.*
[211]20 C.F.R. § 416.926a(h)(2)(iv).
[212]R. at 25 (*citing* 20 C.F.R. § 416.926a(h)(3)).

26

As before, the Court need only determine if the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," thus requiring a remand.[213]

We find it helpful to consider *Murphy v. Astrue*, where during a determination of the attending and completing tasks domain, the Seventh Circuit found that the records indicated that the claimant had difficulty completing his work because of deficits in attention span, concentration, and on-task behavior.[214]  Additionally, the claimant would lose things, worked very slowly, struggled to finish assignments, and turned in incomplete work.[215]  The *Murphy* Court noted that an "ALJ has a duty to fully develop the record before drawing any conclusions and must adequately articulate his analysis so that we can follow his reasoning."[216]  The court then held that the facts the ALJ discussed (school documents which reflected that the claimant was cooperative, tried to follow the rules, and that he wanted to do well in his studies) "did little to counter" claimant's impairment.[217] It concluded that, "[t]hese traits may well be accolades for [claimant], but the ALJ did not explain how or why they trump the evidence of his inability to attend and complete tasks."[218]

Throughout the ALJ's decision, he mentions MW's behavioral issues with focusing and completing tasks. He first noted that teachers found he did well when he chose to focus.[219]  Then he indicated that MW's 2003-2004 school year report card showed MW's failure to cooperate with

---

[213]*Steele*, 290 F.3d at 940.
[214]496 F.3d at 634-35.
[215]*Id.*
[216]*Id.* (internal citations omitted).
[217]*Id.* at 634-35.
[218]*Id.* at 635; *see Giles*, 438 F.3d at 488; *Ribaudo v. Barnhart*, 458 F.3d 580, 583-84 (7th Cir. 2006).
[219]R. at 18, 20.

Mrs. Navarro,[220] that MW was not completing his work,[221] and noted MW's ADHD and ODD.[222] Although these examples are not exhaustive, they demonstrate that the ALJ identified that MW had numerous issues in this domain. But ALJ Harmon concluded that, "the child can focus and attend sufficiently to play video games effectively and utilize computers as he himself testified."[223]

Much like the case in *Murphy*, it may be true that MW could focus enough to play video games, but that fact alone is not enough to trump the evidence that MW had problems in this area. Additionally, the ALJ's statement that the "evidence of record including the school records and testing records support the opinion of the medical examiner,"[224] does not properly indicate which school reports or medical records were used in making this determination, nor does it show how they support the opinion of the ME. Simply because the ALJ noted MW's difficulties in attending and completing tasks, this notation does not alleviate ALJ Harmon of his duty to sufficiently explain the evidence that suggests impairment and how he finds that it does not rise to the level of marked.[225]

## C. Interacting and Relating With Others

MW asserts that the ALJ erred in determining that MW did not reach the level of marked because his behavior was within his volitional control,[226] and particularly that ALJ Harmon did not properly discuss the state agency physician's, Dr. Bone's, opinion.[227] Under "Interacting and Relating With Others," the ALJ found that MW was "somewhere between less than marked and

---

[220]R. at 18.
[221]R. at 18.
[222]R. at 18, 19, 20, 21.
[223]R. at 22.
[224]R. at 26.
[225]*Murphy*, 496 F.3d at 635.
[226]Pl. Mem. at 15.
[227]Pl. Reply at 5.

marked based on the fact that he has no friends and has exhibited behavior problems."[228]  In the Regulations, a school-age child without an impairment should "be developing more lasting friendships with children who are of the same age."[229]  The ALJ provided some examples of difficulties children could have in interacting and relating with others, including not having close friends or that all friends are older or younger than the child.[230]

ALJ Harmon noted that MW had problems with temper control and interacting with other children, including altercations with students.[231]  The ALJ continually acknowledged MW's difficulties with ADHD and ODD, including the fact that he needed to take medication for these conditions.[232]  Importantly, ALJ Harmon also noted that MW said that he had no friends.[233]  But the ALJ did not mentioned the fact that Dr. Bone determined MW's aggression towards peers and siblings, and his hyperactivity, rose to the level of marked.

To support his position that the ALJ's failure to include Dr. Bone's analysis is reversible error, MW cites to *Spiva v. Astrue*.[234]  In *Spiva*, the Seventh Circuit found that even where the ALJ, after considering the entire record, "might have reached the same result" that does not definitively determine that "failure to consider the evidence was harmless."[235]  Thus, unless **"it is predictable with great confidence that the agency will reinstate its decision . . . because [it] is overwhelmingly supported by the record through the agency's original opinion,"** a remand is required.[236]

---

[228]R. at 26.
[229]20 C.F.R. § 416.926a(i)(2)(iv).
[230]R. at 26 (*citing* 20 C.F.R. § 416.926a(i)(3)).
[231]R. at 18.
[232]R. at 18, 19, 20, 21.
[233]R. at 21.
[234]*Spiva v. Astrue*, 628 F.3d 346 (7th Cir. 2010).
[235]*Id.* at 353.
[236]*Id.*

Here, at no point did ALJ Harmon point to the fact that Dr. Bone determined MW to have marked limitations in interacting and relating with others. Without an acknowledgment of Dr. Bone's assessment we cannot say that the ALJ's conclusion was properly based on the record in its entirety. As in *Spiva*, where the Seventh Circuit remanded the case because the ALJ failed to fully consider the evidence,[237] MW's claim should be remanded to properly include and evaluate Dr. Bone's opinion.

It should also be noted that ALJ Harmon found MW to be "somewhere between less than marked and marked."[238] In making this determination, the ALJ acknowledged the fact that both MW and Ms. Terry stated that he had no friends, which is one of the examples under this domain of an impaired child. But again we have the same problem with the ALJ's very brief conclusion that MW "has exhibited behavior problems."[239] ALJ Harmon's decision is, itself, full of examples of MW's behavioral issues. By simply concluding that MW "has exhibited behavioral problems," we do not know what behavioral problems the ALJ considered and why these problems did not rise to the level of marked. Without more, we find a remand appropriate to allow for a more articulate explanation of the ALJ's conclusion.

---

[237] *Id.*
[238] R. at 26.
[239] *Id.*

VII.    **Conclusion**

For the reasons explained above, MW's motion for remand is granted [dkt. 25]. The Court,

therefore, remands the case to the ALJ for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

**Date: April 30, 2012**                              _____

U.S. Magistrate Judge
Susan E. Cox

31